# United States District Court
# District of Massachusetts

**DAVID F. POEHLER**

PLAINTIFF

**v.**

**CIVIL ACTION NO.** 04-30254-MAP

**JOHN E. POTTER, POSTMASTER
GENERAL, USPS**

DEFENDANT

## MORANDUM IN OPPOSITION TO DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

The plaintiff, David F. Poehler ("Poehler"), brings this action against John E. Potter, Jr., United States Postmaster General, under Title VII of the Civil Rights Act of 1964. The plaintiff opposes defendant's motion for summary judgment on the grounds that claims relating to Poehler's efforts to become a supervisor are not barred by the statute of limitations because Poehler of ongoing discrimination and the consolidation of such claims; Poehler can show an adverse employment action and can demonstrate discriminatory motive. Therefore, the defendant is not entitled to summary judgment.

## RESPONSE TO LOCAL RULE 56.1 STATEMENT OP MATERIAL FACTS
## (WITH SUPPLEMENTAL FACTS)

### Employment Backaround

1.      At times relevant to the complaint, Poehler was employed by the United States Postal Service ("Postal Service") Tab A, Poehler Deposition 1,2 pp. 5—11.

Admitted.

2.      In 1996, Poehler worked as a supervisor at the Chicopee Post Office. He resigned in December, 1996, following a disagreement with his supervisor. Tab A, pp. 12—13. After a failed business venture, Poehler returned to the Postal Service in 1997 as a clerk in the Springfield Bulk Mail Center ("BMC") supervised by Al Ream and Mark Sales. Tab A, pp. 22—23. The BMC manager, Robert Koestner, told Poehler he had to complete the Associate Supervisor Program ("ASP") if he wanted to become a supervisor. Tab A, p. 32. The ASP trains supervisors.

Admitted in part and denied in part. A review of the circumstances of Poehler's resignation, which occurred after harassment from his supervisor centering on Poehler's disability status, is necessary to view these facts in a light most favorable to the plaintiff as the non-moving party. A disability note from his physician dated October 17, 1996 indicates Poehler was disabled from work beginning October 11, 1996 and submitted a Doctor's note dated Ocotber 11, 1996, indicating he was incapacitated until November 1, 1996.  He subsequently supplied a noted from the Doctor indicating he was disabled "due to acute stress and depression."  (Ex. 1) Despite these two notes, on October 24, 1996, Poehler's supervisor, Cathy Clark, proposed charges against Poehler based on his absence beginning October 11, 1996. (Ex. 2) On October 25, 1996, Supervisor Clark scheduled a "Fitness for Duty" exam for Poehler with the Post Office Medical Office. (Ex. 3) On October 29, 1996 Postal Medical Officer, Dr. Richard Brody, M.D. notified Ms. Clark that Poehler was not fit for duty, corroborating his disability. (Ex. 4) Poelher returned to work on November 12, 1996. (Ex. 5) By December 2, 1996 Poehler submitted his resignation citing "mental stress" as the reason. The resignation was signed by Ms. Clark. (Ex. 6) The above facts must be viewed in a light most favorable to Poehler as the non-moving party, and in conjunction with the timing and context of the statements by Robert Koestner upon Poehler's return to work eight months later, when he offered Poehler a return to his Supervisory position, and then, after Poehler consultation between Clark and Koestner, informed Poehler concerning the pre-textual grounds of ASP program participation  as the basis for denying Poehler a return to a supervisor's position. A question of fact exists as to whether the ASP program was applicable to plaintiff (as evidenced by the list of other returning supervisor's not required to take the ASP exam set forth in Plaintiff's Answer to Interrogatory Number 1 (Ex. 11) as well as deposition testimony by Poehler, p. 49- 50)

3. Poehler worked as an acting supervisor from 1998 to 1999, when he chose to return to the clerk's job because his workload was too heavy. Tab A, pp. 26—27.

Admitted in part and denied in part. Poehler testified in his deposition that his return to a clerk's position after working as an "acting" supervisor (doing the supervisor's work for less pay) was precipitated by complaints by Poehler about excessive workload without sufficient help:

> "What caused me to go back as a clerk is Mark Sales and Al Hearn started getting rid of all the other supervisors or acting supervisors, and slowly but surely I was running the whole building, you know, I mean, which you end up with like 80 mail handlers and 24 clerks, and that on the overtime they'd call people on days off. I was running four or five areas, the docks, Sanvik sorter, the connector, the bundle sorters, and that was it. And I said, hey, you've got to get me help, I just - - got fatigued. I said look you ain't going to get me help, I can't keep doing this. So, finally I - - I just stepped down because it was just too much. . . . Al Hearn, I told him, I said, I got to - - I can't do this anymore.  . . . They didn't give me any help." (Depo p. 26-27)

Subsequently, in order to replace himself, the employer made Poehler train the ASP recruits in the program. (Depo 27) This is the same program that Koestner used as a pretext to prevent Poehler from returning to employment as a permanent supervisor.  Poehler then found out that a co-worker, Suzanne Bowes, was promoted to a supervisory position in Springfield, Vermont,

without taking the ASP test. This led to the first EEO complaint being filed by poehler in 1999. Subsequently, as set forth in Answers to Interrogatories (Number 1) (Ex. 11) Poehler later learned of other employees promoted or allowed to return to supervisory employment to the post office after a resignation, without ASP participation, and was not provided the encouragement, and support as other employees outside his protected class as far as age, sex, and disability, and has suffered retaliation.

[1]The defendant accepts the facts as true for the purpose of this motion, reserving his right to challenge them at trial.
[2]Poehler's deposition took place on November 7, 2005, and January 20, 2006, and is referenced as Poehler I (Tab A) and Poehler II (Tab B)
[3]An acting supervisory position did not require completion of the ASP.
[4]Poehler was replaced as acting supervisor by Frank Landry. Tab A, p. 29. Landry then went through the ASP and became a permanent supervisor. Tab A, pp. 30—31.

    4.  In 1998, Poehler applied for the ASP but failed the admissions test. Tab A, p. 33, 39.

Admitted in part and supplemented. Based on other employees who resigned and returned as supervisors, without taking the ASP test, Poehler has suffered disparate treatment. (See Answer to Interrogatory Number 1 for list of names) In addition, others who have taken the test and failed have been treated differently as evidenced by the testimony of Poehler in his deposition that, after taking and failing the test for admission to the ASP program, all other employees who took the exam and failed were given another chance to take the exam, and were encouraged to do so:

> Everybody else got a chance to do it again and, well, were called in the office, and I got to be discouraged and I was the only one who wasn't called in the office, I didn't understand why I wasn't called in [by supervisory staff and]  .  .  .  were asked not to be discouraged, to take it again, you know, if they need help, you know, they were going to try to help them. (Poehler Depo p. 33-34)

Poehler testified that other employee's received e-mail notification concerning opportunities to take the ASP, (Poehler Depo 38) while, whenever he asked his supervisors about scheduling the test, they did not provide any assistance (Poehler Depo 37). The last time Poehler had any conversation with Koestner, Poehler inquired as to the ASP program and Koestner said, "I'm not going to tell you anything because the last time I talked to you I found myself in court" (Poehler Depo p. 50)

Poehler stated that he approached the ASP Coordinator after he was told he had not scored high enough on the exam. (Ex. 11) That statement indicates that he asked who corrected the test, how it was scored, and how someone like him, with 8 years experience as a supervisor could not have passed. Poehler stated that he was told that such information "was restricted".

    5.  Poehler worked as a clerk from 1999 to 2001, and a bundle sorter from 2001 to 2004. In 2004, Poehler became an acting supervisor at the BMC in Springfield and transferred to a similar position at the BMC annex in Chicopee in 2005. Tab

A, pp. 5-11.

Admitted.

EEO Complaint 1B-012-0026-99<br>Supervisor Position

6.      At some point in the spring of 1999, Poehler learned that a woman named Suzanne Bowes had been promoted on or about March 10, 1999, to a supervisory position without going through the ASP. Tab A, p. 42

Admitted.

7.      On June 2, 1999, Poehler filed EEO Complaint 1B—012—0026—99, alleging age and sex discrimination based on Bowes' promotion. The complaint identified Koestner as the discriminating official. Tab C, Declaration of Linda Greaney ¶ 6 and Exhibit 1 thereto. Koestner was not involved in Bowes' promotion. Tab A, pp. 48—50.

Admitted in part. After filing that complaint, Poehler learned that another former supervisor, Richard Crowley, separated from the postal service for eighteen months (ten months longer than Poehler had) and had been reinstated by Robert Koestner to his former supervisory position at the Riverdale Facility (within the 010-011 area code) and was not required to take the ASP test. Mr. Crowley later served as a supervisor at the East Longmeadow facility within the 010-111 zip code.

Poeher also learned that Sheri Kania, a level 5 clerk, returned to the BMC facility in the 011 area in late 1999 from a Florida USPS facility. Ms. Kania, who was under 40 years old at the time, and only had acting supervisory experience, was appointed a Maintenance Operations Supervisor at the Springfield BMC, but was not required to take the ASP test.

Poehler also learned that Raymond Hearn, the son of MDO Wayne Hearn, and nephew of Al Hearn, who was under age 40 at the time, was given multiple opportunities to take the ASP exam after failing the exam the first time.

Similarly, Poehler subsequently learned Ms. Robin Belville failed the exam and was afforded additional opportunities to take the exam and was appointed on 7/12/03 as EAS 17, customer Service Representative at the Riverdale installation with the 010-100 area.

Also, Poehler later learned that former Emory employees were hired by the USPS as supervisors, without completing the ASP program.

Poehler testified that the exam never should have been a requirement for him, and he was not afforded the same opportunities as these persons.

Poehler testified that other employee's received e-mail notification concerning opportunities to take the ASP, (Poehler Depo 38) while, whenever he asked his

supervisors about scheduling the test, they did not provide any assistance (Poehler Depo 37). The last time Poehler had any conversation with Koestner, Poehler inquired as to the ASP program and Koestner said, "I'm not going to tell you anything because the last time I talked to you I found myself in court" (Poehler Depo p. 50)

8.    On May 4, 2001, Attorney Mary Ann Lane entered an appearance on behalf of Poehler and subsequently requested a hearing before an Administrative Judge ("AJ") . Tab C, ¶ 7, and Lx. 2 thereto.

Admitted.

9.    On June 26, 2003, an EEOC AJ issued a decision in favor of the Postal Service, finding no discrimination. Tab C, ¶ 9, and Ex. 3 thereto. Poehler appealed to the EEOC Office of Federal Operations ("OFO"), which on October 27, 2003, affirmed the finding of no discrimination and notified Poehler of his right to file a lawsuit within 90 days. Tab C, ¶ 11, and Ex. 6 thereto. Poehler did not file a lawsuit within 90 days of the EEOC decision. Tab C, ¶ 11. Poehler claims he did not receive the OFO decision until March, 2004. Tab B, p. 15. The lawsuit was filed on December 29, 2004.

Admitted.

10.    A number of men and women became supervisors by completing the ASP. Tab A, pp. 28—35.

Admitted.

## EEO Complaint 1B-012-0034-O1
## Retaliation

11.    On June 20, 2001, Poehler filed EEO complaint lB-120034—01, alleging unspecified retaliation based on having filed LEO complaint lB—012—0026—99. The complaint named C. Clark, M. Sales, E. Maio, Alan Hearn and unspecified management as the discriminating officials. Tab C, ¶ 12, and Ex. 7 thereto. Through consolidation and amendment, additional allegations of retaliation were included. Complaint 1B—012—0026—99 was not consolidated with Complaint 1B—12—0034—01. Tab C, ¶ 12, and Exs. 8—10 thereto.

Admitted in part and denied in part. The complaint on its face indicates that it was "consolidated" with other complaints, including the 1999 filing. On the face of the EEO Complaint in Case No. 1B-012-0034-01, in box 15, it is indicated that the matter involves "Consolidated claims 4/27/01, 5/2/01, 5/10/01 Orig. Case # 1B-012-0026-99."

12.    Poehler initially outlined his complaints as follows: (1) a March 15, 2001, notice of removal, which was reduced to a letter of suspension; (2) the hiring of former Emery employees as supervisors; and (3) a November, 2000, investigation into Poehler's disability. Tab C, ¶ 13, at Ex. 11 thereto. The agency accepted the first claim for investigation and dismissed the remaining claims. Tab. C, ¶ 13, and Ex.

12 thereto.

Admitted.

13.     On November 1, 2001, Poehler outlined his claims as follows: (1) the March 15,
        2001, notice of proposed removal; (2) the July 18, 2001, seven—day suspension;
        (3) a comment made by Al Hearn on August 30, 2001; and (4) denial of overtime
        over the Labor Day weekend 2001. Tab C, ¶ 14, and Ex. 13 thereto. An
        amendment added a claim of discrimination relating to a notice of a 14—day
        suspension issued on September 14, 2001. Tab C, ¶ 12, and Ex. 10 thereto.

Admitted.

14.     An EEOC AJ found no discrimination. The Postal Service adopted the AJ's
        decision on September 30, 2004, and notified Poehler of his right to file a lawsuit
        withing 90 days. Tab C, ¶ 17, at Exs. 15 and 16 thereto.

Admitted.

15.     While Poehler testified that he believed the March 15, 2001, notice of proposed
        removal was motivated by retaliation, he could not point to any evidence supporting
        that belief other than the fact that one supervisor was aware he had filed a previous
        EEO complaint. Tab B, pp. 21—24. Poehler's previous EEO complaint was not
        against any of the supervisors responsible for issuing the disciplinary letter. Tab B, p.
        25.

Admitted in part.  There is an ongoing loss of salary and benefits from the refusal to
return him to his former position as a supervisor since June 6, 1999, (the first EEO
complaint) where plaintiff complained to about not being returned to his supervisory
position in 1997, despite Suzanne Bowes being allowed to, without ASP participation,
and subsequently learned of others as detailed previously. Moreover, Plaintiff's
complaints indicate he was denied overtime and holiday work during the Labor Day 2001
holiday weekend.  There was a loss of pay associated with this action when he was not
allowed to work the Labor Day holiday. Moreover, unlike other co-workers, Plaintiff has
produced evidence to suggest that defendant has past him over for promotion (actually
denied his old job and salary) and the employer placed pre-textual testing in his way as a
roadblock to try and limit his return to his original supervisor status while other
employees under similar circumstances, have not been subjected to such requirements.

More specifically, the March 15, 2001, notice of proposed removal, while reduced to a
seven-day suspension after the filing of a union grievance, and while held in abeyance
provided Poehler did not miss more than three days of work within a three month period,
was unwarranted and in retaliation. Medical records reveal this occurred at a time when
Poehler was being treated for emotional distress. The December 15, 2000 records of Dr. J
Ramaswamy, MD is a Disability Note re: back, elbow, and work related depression, and
referral to a psychiatrist. (Ex 7)  The January 31, 2001 records of initial evaluation notes

from Baystate Medical Center documents his condition and recommends that his work setting and supervision be changed. (Ex 8) The March 11, 2001 records of Dr. Ramaswamy, MD includes a report from Dr. Adler psychiatric evaluation also prescribes a return to work under different supervisors or in different environment. (Ex 9) By November 6 of 2001 the records of psychiatrist Diedre Reynolds, MD prescribe a medical leave of absence due to mental health concerns, with an indefinite time period.(Ex. 10)

Additional evidence of harassment includes the sending of a letter, dated February 10, 2001 by Thomas Rayson, Supervisor, notifying Pohler that he was in violation of attendance rules, despite receipt of disability notes from Poehler. Evidence of intent is sown by the fact that Rayson included a blank resignation form with the letter, apparently a reference to Poehler's earlier resignation when he was suffering emotional distress and resigned for eight months. (Ex. 13)

16.     The March 15, 2001, notice of proposed removal notified Poehler that he would be terminated because he had been absent since November 30, 2000, and had failed to contact his supervisors or provide documentation justifying his absence. Tab D. As a result of a union grievance, the removal was reduced to a seven—day suspension, which was held in abeyance as long as Poehler was not absent for more than three days in the following three months. Tab C, Ex. 13. After missing more than three days of work in a three—month period, the Postal Service invoked the seven—day suspension. The suspension was "in—house" and did not result in any loss of pay. Tab C, Ex. 13; Tab B, pp. 27—29. Poehler could not point to any evidence supporting his belief that the disciplinary action was discriminatory. Ex. B, p. 29.

Admitted in part. There is an ongoing loss of salary and benefits from the refusal to return him to his former position as a supervisor since June 6, 1999, (the first EEO complaint) where plaintiff complained to about not being returned to his supervisory position in 1997, despite Suzanne Bowes being allowed to, without ASP participation, and subsequently learned of others as detailed previously. Moreover, Plaintiff's complaints indicate he was denied overtime and holiday work during the Labor Day 2001 holiday weekend. There was a loss of pay associated with this action when he was not allowed to work the Labor Day holiday. Moreover, unlike other co-workers, Plaintiff has produced evidence to suggest that defendant has past him over for promotion (actually denied his old job and salary) and the employer placed pre-textual testing in his way as a roadblock to try and limit his return to his original supervisor status while other employees under similar circumstances, have not been subjected to such requirements.

More specifically, the March 15, 2001, notice of proposed removal, while reduced to a seven-day suspension after the filing of a union grievance, and while held in abeyance provided Poehler did not miss more than three days of work within a three month period, was unwarranted and in retaliation. Medical records reveal this occurred at a time when Poehler was being treated for emotional distress. The December 15, 2000 records of Dr. PJ Ramaswamy, MD is a Disability Note re: back, elbow, and work related depression, and referral to a psychiatrist. (Ex 7) The January 31, 2001 records of initial evaluation

notes from Baystate Medical Center documents his condition and recommends that his work setting and supervision be changed. (Ex. 8) The March 11, 2001 records of Dr. Ramaswamy, MD include a report from Dr. Adler psychiatric evaluation prescribes a return to work under different supervisors or in different environment. (Ex. 9) By November 6 of 2001 the records of psychiatrist Diedre Reynolds, MD prescribe a medical leave of absence due to mental health concerns, with an indefinite time period. (Ex. 10)

17.     Hearn's comment, which was the subject of Complaint 13—012—0034—01, took place on August 30, 2001, when Hearn expressed his feelings to Poehler about being named in an EEO complaint. Tab C, Ex. 13; Tab B, pp. 29—30. Hearn was married to Poehler's cousin and the two had a friendly relationship at the time the comment was made. Tab B, p 30.

Admitted.

18.     Before Labor Day, 2001, Poehler asked Hearn if he could have the weekend off; Hearn agreed. When the scheduling book showed that Poehler was scheduled for work on Labor Day, he asked that he be allowed to work the weekend so that he could get overtime. Hearn told him that he could not work the weekend because the schedule was already finalized. Ultimately, Poehler was not required to work on Labor Day. Tab B, pp. 32—33.

Admitted. However, the issue, in a light most favorable to plaintiff is not being "required" to work, Poehler's complaint is being *denied* the opportunity to work.

19. EEO complaint 13—012—0034—01 also addressed Poehler's complaint about a 14—day suspension issued on September 29, 2001, for failure to be regular in attendance. Tab B, pp, 34—35. Poehler acknowledged that he had not been regular in attendance and did not have evidence of similarly situated employees who were treated differently. Tab B, pp. 35—37.

Admitted in part.  There is an ongoing loss of salary and benefits from the refusal to return him to his former position as a supervisor since June 6, 1999, (the first EEO complaint) where plaintiff complained to about not being returned to his supervisory position in 1997, despite Suzanne Bowes being allowed to, without ASP participation, and subsequently learned of others as detailed previously. Moreover, Plaintiff's complaints indicate he was denied overtime and holiday work during the Labor Day 2001 holiday weekend.  There was a loss of pay associated with this action when he was not allowed to work the Labor Day holiday. Moreover, unlike other co-workers, Plaintiff has produced evidence to suggest that defendant has past him over for promotion (actually denied his old job and salary) and the employer placed pre-textual testing in his way as a roadblock to try and limit his return to his original supervisor status while other employees under similar circumstances, have not been subjected to such requirements.

More specifically, the March 15, 2001, notice of proposed removal, while reduced to a seven-day suspension after the filing of a union grievance, and while held in abeyance

provided Poehler did not miss more than three days of work within a three month period, was unwarranted and in retaliation. Medical records reveal this occurred at a time when Poehler was being treated for emotional distress. The December 15, 2000 records of Dr. PJ Ramaswamy, MD is a Disability Note re: back, elbow, and work related depression, and referral to a psychiatrist.  (Ex 7 )The January 31, 2001 records of initial evaluation notes from Baystate Medical Center documents his condition and recommends that his work setting and supervision be changed. (Ex. 8) The March 11, 2001 records of  Dr. Ramaswamy, MD include a report from Dr. Adler psychiatric evaluation prescribes a return to work under different supervisors or in different environment. (Ex. 9) By November 6 of 2001 the records of psychiatrist Diedre Reynolds, MD prescribe a medical leave of absence due to mental health concerns, with an indefinite time period. (Ex. 10)

### EEO Complaint 1B-O11-0008-03
### Custodial Position

20.     On May 29, 2003, Poehler filed EEO Complaint 1B— 011—0008—03, alleging age and disability discrimination as well as retaliation in the April 7, 2003, denial of a transfer to a custodial position. This time, Poehler named Richard Wentzel as the discriminating official. Tab C, ¶ 18, and Ex. 17 thereto. Poehler did not request a hearing and on November 1, 2004, the Postal Service issued a final decision denying his claim and notifying him of the right to file a lawsuit within 90 days. Tab C, ¶¶ 19, 20 and Exs. 18 and 19 thereto.

Admitted.

21.     Poehler testified that he believed that Wentzel's decision was motivated by disability discrimination because Wentzel told him that the job involved climbing ladders and other physical labor. Poehler acknowledged that he was not capable of doing that type of manual work. Poehler also believed that Wentzel's decision was motivated by age discrimination because Wentzel hired a younger worker for the job. Finally, Poehler believed that Wentzel's decision was motivated by retaliation for Poehler's prior EEO activity, even though Poehler acknowledged that Wentzel was not aware that Poehler had filed any EEO complaints. Tab B, pp. 39—42.

Admitted.

### The Lawsuit

22.     Poehler filed this lawsuit on December 29, 2004, alleging that he was not permitted to become a supervisor without participating in the ASP program. Complaint, unnumbered third paragraph. According to Poehler, this civil action was filed after he received the final agency action on September 30, 2004, in EEO Complaint 13—012—0034—01. Poehler claims that the lawsuit encompasses Complaint 1B—012—0034—01, Complaint 13—021—0026—99, and Complaint 1B—001—0008—03. Tab E, Interrogatory Response 1.

Admitted.

## SUPPLEMENTAL FACTS SUBMITTED BY PLASINTIF

1.      This complaint is based on discrimination on account of plaintiff's age, sex and disability (physical and emotional) and in retaliation for filing prior complaints. This case was filed December 29, 2004 after plaintiff received notice of final decision dated September 30, 2004, in EEO Agency No. 1B-01200034-01, filed June 20, 2001, that complained of unlawful discrimination in retaliation for EEO activity, when: (1) on March 15, 2001, plaintiff was issued a Notice of Proposed Removal charging him with failure to comply with an official directive and AWOL; (2) on July 18, 2001, a 7 Day Suspension held in abeyance as a reduction to his Proposed Removal, was invoked; (3) on or about August 30, 2001 Acting Manager Distribution Operations Al Hearn threatened plaintiff regarding EEO activity; and (4) Plaintiff was denied overtime and holiday work during the Labor Day 2001 holiday weekend. Plaintiff also claimed discrimination based on mental and physical disabilities, and in retaliation for prior EEO activity when on September 29, 2001, he was issued a Notice of 14-Day Suspension charging him with failure to be regular in attendance. (Plaintiffs Answers to Interrogatory Number 1 – Ex 1)

2.      This EEO case was consolidated with EEO Agency number 1B-021-0026-99, filed June 6, 1999, where plaintiff complained to EEO about not being able to return to his supervisory position in 1997. This was after plaintiff had learned that a woman, Suzanne Bowes, a PTF mail handler (level 4) approximately 25 years old at the time, who had less experience as a supervisor than me, was promoted from the BMC to Supervisor (Level 16) in Springfield, VT, even though she had not completed the ASP program. In defense of this claim, Koestner claimed that, because Springfield, VT was not in the 010- 011 zip code, the ASP had not been required. (Plaintiffs Answers to Interrogatory Number 1 – Ex 1)(See also EEO complaint.)

3.      After filing that complaint, Plaintiff learned that another former supervisor, Richard Crowley, separated from the postal service for one and one half years and had been reinstated by Robert Koestner to his former supervisory position at the Riverdale Facility (within the 010-011 area code) and was not required to take the ASP test. Mr. Cowley later served as a supervisor at the East Longmeadow facility within the 010-111 zip code. (Plaintiffs Answers to Interrogatory Number 1 – Ex 1)

4.      Plaintiff also learned that Sheri Kania, a level 5 clerk, returned to the BMC facility in the 011 area in late 1999 from a Florida USPS facility. Ms. Kania, who was under 40 years old at the time, and only had acting supervisory experience, was appointed a Maintenance Operations Supervisor at the Springfield BMC, but was not required to take the ASP test. (Plaintiffs Answers to Interrogatory Number 1 – Ex 1)

5,      Plaintiff also learned that Raymond Hearn, the son of MDO Wayne Hearn, who was under age 40 at the time, was given multiple opportunities to take the ASP exam after failing the exam the first time. (Plaintiffs Answers to Interrogatory Number 1 – Ex 1)

6.      Similarly, Plaintiff subsequently learned Ms. Robin Belville failed the exam and was afforded additional opportunities to take the exam and was appointed on 7/12/03 as EAS 17, customer Service Representative at the Riverdale installation with the 010-100 area. (Plaintiffs Answers to Interrogatory Number 1 – Ex 1)

7.      Fran Demaio received encouragement and multiple opportunities to take ASP test after initial failure, as did a friend of hers whose name plaintiff cannot remember and other individuals received notification by e-mail as to ASP participation and exam information, special treatment plaintiff did not receive. (Plaintiffs Answers to Interrogatory Number 1 – Ex 1)

8.      Also, plaintiff learned that former Emory employees were hired by the USPS as supervisors, without completing the ASP program. (Plaintiffs Answers to Interrogatory Number 1 – Ex 1)

9.      The exam never should have been a requirement for plaintiff, and plaintiff was not afforded the same opportunities as other persons. (Plaintiffs Answers to Interrogatory Number 1 – Ex 1)

10.     This case also is an appeal from a notice of final decision dated November 1, 2004 on EEO case #1B-001-0008-03, filed May 29, 2003, that complained of unlawful discrimination based on age and disability and in retaliation for prior EEO activity, when on April 7, 2003, and plaintiff's request for transfer to a custodial position was denied. (Plaintiffs Answers to Interrogatory Number 1 – Ex 1)

11.     Despite the above, plaintiff continues to be denied a permanent supervisor position due to unlawful discrimination based on age, sex, and disability, as well as in retaliation for prior EEO filings. (Plaintiffs Answers to Interrogatory Number 1 – Ex 1)

12.     Evidence from Poehler's other EEO claims also provide relevant evidence. Specifically, on April 11, 2002, Poehler filed EEO Complaint 1B—0l2—0031—02 alleging disability discrimination and retaliation in connection with the following events: (1) not being made whole following the rescission of a letter of removal; (2) not allowing him to return to work until February 14, 2002, following the rescission of a letter of removal; (3) denying his request for sick leave on January 12, 2002; (4) not timely processing his worker's compensation claim; and (5) not providing a reasonable accommodation. Tab C, ¶ 21, an Lx. 20 thereto.

13.     A more detailed outline of the basis for discrimination is contained in the statement attached as Exhibit A to Plaintiff's answers to interrogatories which is incorporated here and attached as Exhibit 12.


## ARGUMENT

### I.     The Summary Judgment Standard

A court must be "particularly cautious" about granting summary judgment when the state of mind of one of the parties is in issue. *Stepanischen v. Merchants Despatch Transportation Corp.,* 722 F.2d 922, 928 (1st Cir.1983) (*citing Hahn v. Sargent,* 523 F.2d 461, 464 (1st Cir.1975), *cert. denied,* 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976)). However, the existence of a state of mind issue does not "automatically preclude summary judgment." *Id* at 929 The party opposing the motion must present some indication that "he can produce the requisite quantum of evidence" to entitle him to a trial. *Hahn,* 523 F.2d at 468; *Stepanischen*, 722 F.2d at 929 *Velazquez v. Chardon,* 736 F.2d 831, 833 (1st Cir.1984).

In cases involving an issue of intent, direct evidence of defendant's intent seldom exists. Before granting summary judgment, the court is required to determine "whether plaintiff could prevail if a jury or judge believed plaintiff's version of the facts and disbelieved defendant's version." *Stepanischen*, 722 F.2d at 929.

### II.     The Claim Relating to the Supervisory Position Is Not Barred by the Statute of Limitations

Defendant claims that Poehler's claim with regard to the ASP in order to become a supervisor is barred because he failed to file this lawsuit within 90 days of the EEOC decision on that issue. While a plaintiff must file his discrimination lawsuit within 90 days of receipt of the "right to sue" letter, 42 U.S.C. § 2000e—5(f) (1), where complaints are consolidated, the statute

of limitations does not run until 30 days after receipt of the decision is final. In the instant case, the final EEOC decision denying Poehler's claim indicates it was mailed September 27, 2004. For purposes of timeliness it is presumed that the decision was received within five (5) calendar days after in thus any civil action had to be filed within 90 days of October 2, 2004. Poehler's lawsuit, was filed on December 29, 2004 within the 90 day deadline.

Moreover, where "recognized equitable consideration" exists the court can extend the limitation period. *Rice v. New England College*, 676 F.2d 9, 11 (1st Cir. 1982). Any claim that Poehler failed to meet the 90 day time period should be tolled based on the indication on the complaints that the actions were "consolidated". On the face of the EEO Complaint in Case No. 1B-012-0034-01, in box 15, it is indicated that the matter involves "Consolidated claims 4/27/01, 5/2/01, 5/10/01 Orig. Case # 1B-012-0026-99." The claimant was actively pursuing his judicial remedies *pro se* by filing a pleading during the statutory time period, although the pleading may have been defective based on its pro se nature. "It is clear that ⋯ a *pro se* litigant [is] entitled to have his pleadings liberally construed" ). *See cf. Haines v. Kerner,* 404 U.S. 519, 520-21 (1972) (per curiam) (reviewing and reversing a Rule 12(b)(6) dismissal of a *pro se* prisoner's § 1983 complaint, concluding that the allegations of injuries and deprivation of rights "however inartfully pleaded, [were] sufficient to call for the opportunity to offer supporting evidence," stating that it holds the allegations in a *pro se* complaint "to less stringent standards than formal pleadings drafted by lawyers" ). Equitable tolling applies generally to Title VII lawsuits against the government. *Id*. at 96.

In this case, Poehler, while represented by counsel at the time of the October 27, 2003, was not represented by counsel at the time of final agency action in September 2004 and there is evidence that he attempted to pursue his rights. Considering the status of the cases as

consolidated, there would be no reason Poehler to have filed a lawsuit in March 2004, (the time when Poehler claims he received actual notice of the decision), while the balance of the consolidated claims were not yet decided.

### III.     Poehler Suffered An Adverse Employment Action

As to Poehler's remaining claims, he can show that he suffered an adverse employment action, a prerequisite for a discrimination claim. *Marrero v. Goya of Puerto Rico, Inc.,* 304 F.3d 7, 22 (1st Cir. 2002) (*citing Hernandez—Torres v. Intercontinental Trading. Inc.,* 158 F.3d 43, 47 (1st Cir. 1998)). "To be adverse, an action must materially change the conditions of the plaintiff's employment." *Gu v. Boston Police Dept.*, 312 F.3d 6, 14 (1st Cir. 2002). Typically, the employer must either (1) take something of consequence from the employee, say, by discharging or demoting him, reducing his salary, or divesting him of significant responsibilities, *see Crady v. Liberty Nat. Bank & Trust Co.,* 993 F.2d 132, 136 (7th Cir.1993); *Connell v. Bank of Boston],* 924 F.2d [1169,] 1179 [ (1st Cir.1991) ], or (2) withhold from the employee an accouterment of the employment relationship, say, by failing to follow a customary practice of considering [him] for promotion after a particular period of service, *see, e.g., Hishon v. King & Spalding,* 467 U.S. 69, 75-76, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).*Blackie,* 75 F.3d at 725-26 (parallel citations omitted). Determining whether an employee has suffered a material adverse employment action "necessarily requires a case-by-case inquiry." *Id.* at 725 (citing *Welsh v. Derwinski,* 14 F.3d 85, 86 (1st Cir.1994); 2 LEX K. LARSON, EMPLOYMENT DISCRIMINATION, § 34.04 (2d ed.1994)).

In this case, plaintiff was subjected to adverse employment action and suffered severe emotional distress documenting his disability from work. There is an ongoing loss of salary and

benefits from the refusal to return him to his former position as a supervisor since June 6, 1999, where plaintiff complained to EEO about not being able to return to his supervisory position in 1997. Moreover, Plaintiff was denied overtime and holiday work during the Labor Day 2001 holiday weekend.  There was a loss of pay associated with this action when he was not allowed to work the Labor Day holiday. Moreover, unlike other co-workers, Plaintiff has produced evidence to suggest that defendant has past him over for promotion (actually denied his old job and salary) and the employer placed pre-textual testing in his way as a roadblock to try and limit his return to his original supervisor  status while other employees under similar circumstances, have not been subjected to such requirements. Thus, each such action, standing alone, was a material adverse employment action. When those actions are considered collectively with the long history of animosity, (including the groundless suspension and discharge letters) such allegations create triable issues of fact adequate to defeat defendants' motion for summary judgment at the level of severity necessary to be considered "adverse employment actions" as documented by medical records.

More specifically, Defendant argues that the March 15, 2001, notice of proposed removal was reduced to a seven-day suspension, while held in abeyance provided Poehler did not miss more than three days of work within a three month period. Medical records reveal this occurred at a time when Poehler was being treated for emotional distress. The December 15, 2000 records of Dr. PJ Ramaswamy, MD include a Disability note re: back, elbow, and work related depression, and referral to a psychiatrist. (Ex. 7) The January 31, 2001 records of initial evaluation notes from Baystate Medical Center documents his condition and recommends that his work setting and supervision be changed. (Ex. 8) The March 11, 2001 records of Dr. Ramaswamy, MD include a report from Dr. Adler psychiatric evaluation prescribes a return to

work under different supervisors or in different environment. (Ex. 9) By November 6 of 2001 the records of psychiatrist Diedre Reynolds, MD prescribe a medical leave of absence due to mental health concerns, with an indefinite time period. (Ex. 10)

Under the circumstances, the invocation of the suspension was groundless, despite its status as "in house" and, viewed in a light most favorable to Plaintiff, exacerbated his emotional distress, and led to a period of disability which involved a loss of pay.

Similarly, Defendant trivializes the August 30, 2001, comment by Hearn about being named in an EEO complaint claiming it fails to meet the threshhold for an adverse employment action claiming Hearn's remark was "isolated, unremarkable and plainly insufficient to support a discrimination claim". Defendant refers to the fact that Hearn and Poehler had a social relationship as evidence. In fact, such evidence, viewed in a light most favorable to plaintiff, should, as a matter of common sense, should be considered "adverse". It is one thing to believe that people who you have no relationship with are treating you illegally, but the emotional distress would only be heightened when those who you trust appear to have turned against you. Accordingly, the actions complained of do constitute an adverse employment action.

### IV.    Poehler Can Establish A Prima Facie Case of Discrimination

Defendant argues Poehler's complaint cannot survive summary judgment because he has no evidence that the Postal Service was acting with a discriminatory motive. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). "[T]he plaintiff must ordinarily do more than impugn the legitimacy of the employer's asserted justification; he must also adduce evidence 'of the employer's discriminatory animus'." *Vega v. Kodak Caribbean Ltd.*, 3 F.3d 476, 479 (1st Cir. 1993), *quoting Mesnick v. General Elec. Co.*, 950 F.2d 816 (1st Cir. 1991).

A plaintiff should not be required to produce "smoking-gun" evidence before prevailing

in a discrimination suit. Circumstantial evidence in this case such as comments Hearn denigrating Poehler for filing a complaint, shortly after filing his complaint, together with the incidence of differential treatment in the workplace, with regard to promotions without resort to the ASP program, provides evidence of discrimination which, as part of an aggregate package of proof offered by the plaintiff, meets the requirement of showing "pretext" sufficient to defeat summary judgment here. *Olivera v. Nestle Puerto Rico, Inc.,* 922 F.2d 43, 49, 50 (1st Cir.1990).

Further evidence of differential treatment is evidenced by the testimony of Poehler in his deposition that, after taking and failing the test for admission to the ASP program, all other employees who took the exam and failed were given another chance to take the exam, and were encouraged to do so.

> Everybody else got a chance to do it again and, well, were called in the office, and I got to be discouraged and I was the only one who wasn't called in the office, I didn't understand why I wasn't called in [by supervisory staff and] . . . were asked not to be discouraged, to take it again, you know, if they need help, you know, they were going to try to help them. (Poehler Depo p. 33-34)

Poehler testified that other employee's received e-mail notification concerning opportunities to take the ASP, (Poehler Depo 38) while, whenever he asked his supervisors about scheduling the test, they did not provide any assistance (Poehler Depo 37). The last time Poehler had any conversation with Koestner, Poehler inquired as to the ASP program and Koestner said, "I'm not going to tell you anything because the last time I talked to you I found myself in court" (Poehler Depo p. 50)

In light of these facts, summary judgment is not warranted. Particularly in light of the fact that Defendant's argument is based on an attack as to the credibility of Plaintiff's claims. Defendant brief cites the "constantly changing focus of Poehler's various EEO claims" as "a

strong indication that the claims lack substance." Such arguments may be fodder for cross examination or argument to a jury, but should not be considered by the court at this stage of the proceedings in light of the other evidence.

Defendant claims that Poehler's claim involving Koestner relating to the ASP was based on Poehler's belief that Susan Bowes was promoted to a supervisory position without going through the training program, and that the fact that Poehler conceded that Bowes was hired in Vermont is an Koestner that Koestner had no involvement in her promotion. Tab A, pp. 48—50. However, there is no specific fact to show that Koestner had no involvement. In fact, considering Koestner's position, is defies common sense to think a en employee under him would obtain the type of promotion she received in Vermont without input from Koestner.

Moreover, as Poehler testified in his deposition, his belief that Mr. Koestner has discriminated against him is not only based on the Suzanne Bowes employment decision, but is also based on the fact that an employee named Bill Crawley:

> "didn't like working at the Bulk Mail Center, was transferred over to West Springfield, didn't like West Springfield branch, quit, was gone for a total of 18 months, job he was at, private, fell through, and he called up Bob Koestner. Bob Koestner brought him back to West Springfield as a supervisor with no repercussion" (Poehler Depo p.50)

Similarly, the fact that Poehler, with regard to the March 15, 2001, notice of proposed removal to retaliation, only has knowledge that one of the four supervisors named in the complaint was aware that he had filed a previous EEO action, and that the prior EEO action was not against that supervisor, is a factual fish inappropriate for summary judgment. The fact that one of the four had knowledge should suffice. Tab B, pp. 21—25.

Defendant's claim that there is no temporal proximity between the June 1999 complaint and the proposed removal is irrelevant in light of the ongoing nature of discrimination. The

medical records substantiate the causal connection with ongoing emotional distress with his supervisors, leading to a period of disability. Under the circumstances, the facts demonstrate sufficient temporal proximity between the protected conduct and the employment action in this case to make out a prima facie case *Calero—Cerezo v. United States Department of Justice*, 355 F.3d 6 (1st Cir. 2004). Tab B, pp. 35- 37.

As to the denial of a transfer to the custodial position, Poehler acknowledged that he was not capable of performing the work required by the job. Therefore, it is difficult to conceive of how the denial was discriminatory. EEO complaints relating to disciplinary action in July and September, 2001, and the alleged denial of overtime over Labor Day weekend 2001 were added to Complaint 1B—0l2—0034—01 through amendment and consolidation. Tab C, ¶ 12, and Exs. 8—10 thereto.

In sum, Poehler's circumstantial evidence surrounding the Postal Service's discriminatory motives is sufficient to defeat summary judgment.

<u>CONCLUSION</u>

For the reasons stated above, the Plaintiff respectfully requests that the motion be denied.

> Respectfully submitted,
> Plaintiff
>
> By:    __/s/ Edward M. Pikula_____
>        Edward M. Pikula, Esq.
>        BBO#399770
>        O'CONNOR, MARTINELLI, CULLINAN
>        & PIKULA
>        1391 Main Street – Suite 1022
>        Springfield, Massachusetts 01103
>        Telephone:    (413) 781-5311
>        Telefax:      (413) 727-2706

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the

registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered on this 14th day of May 2006.

/s/ Edward M. Pikula

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

## CLERK'S NOTICE

The image of this document is not viewable because it is either SEALED or filed EX PARTE.